**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** ) | |
| **MELISSA D. ZEDIKER,** ) | |
| ) | |
|     **And** ) | |
| ) | |
| **STATE OF GEORGIA ex rel. MELISSA** ) | |
| **D. ZEDIKER,** ) | **Civil Action No. 5:15-CV-417 (MTT)** |
| ) | |
|     **Plaintiff – Relator,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ORTHOGEORGIA.** ) | |
| ) | |
|     **Defendant.** ) | |

## <u>ORDER</u>

On November 9, 2015, Relator Melissa Zediker brought a *qui tam* action under

the False Claims Act, 31 U.S.C. §§ 3729-3732 ("FCA"), and the Georgia False Medicaid

Claims Act, O.C.G.A. § 49-4-168, *et seq.* ("GFMCA"), alleging the Defendants[1]

submitted false claims to federal healthcare programs and took illegal kickbacks. *See*

*generally* Doc. 2. After the Government (the United States and the State of Georgia),

intervened with its own complaint and some Defendants were dismissed, the Relator,

the Government, and Defendant OrthoGeorgia[2] reached a $760,000.00 settlement of

the Government's claims. The only remaining issues are (1) what percentage of the

settlement Zediker should recover for her contribution to the *qui tam* action and (2) what

---

[1] Initially, there were two groups of defendants in the case: OrthoGeorgia and related parties, and Urology Specialists of Georgia ("USG") and related parties. As discussed below, the Government dismissed the USG group after determining there was not enough evidence to substantiate Zediker's allegations.

[2] OrthoGeorgia, formerly two separate orthopaedic practices known as OrthoGeorgia and Forsyth Street Orthopaedics, is a medical provider of orthopaedic services comprised of 37 entities and individuals listed in the caption of the Complaint.

amount Zediker's counsel should be awarded in attorneys' fees and costs. For the following reasons, Zediker is awarded a 15% share (**$114,000.00**) of the $760,000.00 settlement amount, and her counsel are awarded **$145,303.37** in attorneys' fees and costs.

## I. BACKGROUND

Zediker was employed by OrthoGeorgia for over ten years. Doc. 2 ¶ 30. She initially handled administrative work, then worked her way up to become Chief Operating Officer. *Id.* After leaving OrthoGeorgia in December 2014, Zediker worked for now-dismissed defendant Urology Specialists of Georgia ("USG") until she was terminated in July 2015. *Id.* ¶ 32. Zediker was then arrested and subsequently indicted under state law for stealing from OrthoGeorgia and USG. Coincidentally, or not, between the time of her arrest and indictment, Zediker filed this *qui tam* action against OrthoGeorgia and USG. Apparently convinced that Zediker had a "near photographic memory," Zediker's counsel included in the 158-page complaint a vast and wide array of allegations, so vast and so wide that the Government argues the complaint was a mostly unhelpful "shotgun" pleading. Docs. 44 at 13; 47 at 14; *see generally* Doc. 2. Shortly after filing her complaint, Zediker asked the Court to unseal her complaint because of the criminal proceeding. Doc. 52 n.12. While her *qui tam* complaint may have been of some benefit to Zediker in the criminal prosecution, from that point forward, the Government could not investigate the case covertly. *See* Doc. 47 at 3.

Still, the Government thoroughly investigated Zediker's myriad theories of liability and concluded most were "not substantiated by other evidence, were not valuable enough to be worthy of pursuit, were not legally viable, or were factually impossible in

light of the factual claims submitted by the Defendants." Doc. 47 at 5. According to the Government, had Zediker complied with Federal Rule of Civil Procedure 9(b)'s pleading requirements for fraud, she would have made the Government's job much easier. For example, a properly drafted complaint could have likely eliminated the need for the Government to ask extensive follow-up questions about the allegations and "expend a disproportionate number of resources at the outset of the case to develop a meaningful investigative plan." *Id.* at 4-5. But even then, Zediker's responses were not satisfactory. For example, Zediker misidentified a key witness for one of her claims. *Id.* at 5-6.

Perhaps most significantly, the Government doubted, reasonably, Zediker's credibility and usefulness, given, initially, the pending criminal charges and, ultimately, her guilty plea to 50 counts of theft and forgery. *Id.* at 3, 7. Unquestionably, and pretermitting whether Zediker's *qui tam* complaint was in whole or in part a tactic employed in Zediker's criminal defense,[3] Zediker's crimes have loomed large throughout this litigation. In her guilty plea colloquy, the presiding judge told Zediker that "[r]egardless of what OrthoGeorgia or the other entity may have been doing . . . [t]wo wrongs don't make a right. . . ." Doc. 47-2 at 33:13-15. Zediker's wrongs were certainly significant. In a nutshell, through a multifaceted series of fraudulent schemes involving company credit cards, misuse of social security numbers, and forged loan applications, Zediker stole $711,881, or at least that's what she agreed to pay in restitution. *Id.* at 5-16, 35. According to the prosecution, the evidence would have showed that Zediker stole more. Doc. 47-2 at 8.

---

[3] If it was, it seems to have failed.

The Government only learned of Zediker's guilty plea the day after it was entered, and only then from news coverage and counsel for OrthoGeorgia. Doc. 47 at 7. Up until then, Zediker's counsel had assured the Government that the criminal charges were "trumped up." *Id.* at 17. Clearly, this was not true. *Id.*

As the Government came to the realization that almost all of Zediker's claims lacked merit, it engaged in settlement discussions with OrthoGeorgia. Persistently and aggressively, Zediker attempted to inject her rejected allegations into those discussions. The Government, convinced her allegations were unfounded, again and again rebuffed Zediker, sticking to its decision to narrow the case and dismiss USG as a defendant. *Id.* at 8.

In December 2018, the Government and OrthoGeorgia reached an agreement in principle, which Zediker strongly opposed. *Id.* Then, days before the Government's deadline to intervene, Zediker "abruptly changed position, reserving only disputes concerning Relator's share and attorney's fees." *Id.* at 9. Zediker agreed "that [the] Agreement is fair, adequate, and reasonable under all the circumstances." Doc. 47-1 at 5.

On February 19, 2019, with the final settlement pending, the Government filed its scaled-down intervenor complaint and dismissed USG as a defendant. Docs. 35; 36. The complaint raised only three relatively minor claims. *See generally* Doc. 35. They were: (1) the E/M-Injection claim, (2) the Arthrex claim, and (3) the Veritas claim.[4]

---

[4] The E/M-Injection claim involved OrthoGeorgia submitting claims for payment for established patient office visits with "-25" modifiers affixed on the same date of service, beneficiaries receiving an injection, and OrthoGeorgia falsely claiming that those office visits were separately significant from the injections received by beneficiaries on that date of service; the Arthrex claim involved OrthoGeorgia submitting claims for payment for shoulder surgery procedures that utilized implants that were provided for free by vendors in violation of the Anti-Kickback Statute, which caused false claims to be submitted to Medicare and Medicaid; and the Veritas claim involved OrthoGeorgia referring urine drug screens to Veritas

Significantly, of Zediker's 158-page complaint, only a small fraction of the allegations are specifically related to these claims.  Docs. 47 at 4; 47-1 at 2; *see generally* Doc. 2.  On March 27, 2019, the parties filed a joint stipulation of dismissal, stating that the parties had finalized their settlement agreement.  Doc. 38.  Pursuant to the agreement, OrthoGeorgia paid $760,000, only $380,000 of which was restitution.  *See generally* Doc. 47-1; Doc. 47 at 3.

## II. DISCUSSION

In her briefing, Zediker expends much energy extolling generally the virtues of the FCA—a point, the Court told Zediker's counsel, not necessary to make; the Court knows the FCA to be a good thing, its experience in this case notwithstanding.  Enacted in 1863 in an effort to combat massive fraud perpetrated by large contractors during the Civil War, the FCA prohibits false or fraudulent claims for payment from the Government.  *Universal Health Servs., Inc. v. United States ex. rel. Escobar*, — U.S. —, 136 S. Ct. 1989, 1996 (2016) (internal quotation marks and citation omitted).   The FCA authorizes civil actions to remedy such prohibited conduct, which may be brought by the Attorney General, 31 U.S.C. § 3730(a), or by private individuals in the Government's name, § 3730(b)(1), also known as "qui tam" suits.  *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1321-22 (11th Cir. 2009).  When an FCA suit is brought by an individual, the Government has the right to intervene and take control of the action.  31 U.S.C. § 3730(b)(2), (c)(1).  When the Government intervenes and the suit is successfully concluded, the FCA provides that the individual initiating the suit—known as the relator—is entitled to an award, or relator's share, of "at least 15 percent but not more

Laboratories in exchange for prohibited remuneration in violation of the Anti-Kickback Statute, causing the submission of false claims to Medicare and Medicaid.  Doc. 47-1 at 2.

than 25 percent of the proceeds of the action or settlement of the claim, depending

upon the extent to which the person substantially contributed to the prosecution of the

action," plus reasonable attorneys' fees and costs.  31 U.S.C. § 3730(d)(1).

## A.    Relator's share

The Government contends that Zediker is entitled to the statutory minimum

share: 15% of the $760,000 settlement.  Doc. 47 at 13.  Zediker strongly disagrees.

She unhelpfully devotes a significant portion of her briefs complaining about how the

Government's "cram[ming] statutory minimums on relators" shows its "animosity toward

relators."[5]  *See* Docs. 44 at 3-7; 52 at 2-7.  She then argues that, under the "two-prong

contribution" test, she should be awarded a 24% share.  *Id.* at 9, 20.  Her argument

lacks merit.

The 15% minimum share is typically considered a finder's fee.  *United States ex*

*rel. Alderson v. Quorum Health Grp. Inc.,* 171 F. Supp. 2d 1323, 1331 (M.D. Fla. 2001).[6]

"This incentive compensation is paid to a relator 'even if that person does nothing more

than file the action in federal court.'"  *Id.* n.29 (quoting 132 Cong. Rec. H9382–03 (Oct.

7, 1986) (statement of Rep. Berman)).  Congress permits increased rewards, "above

15% and *up to* 25%," to "encourage assistance from the private citizenry that can make

a significant impact on bolstering the Government's fraud enforcement effort."  *See id.* at

1331, 1332 (quoting S.Rep. No. 99–345 at 8 (1986) and 132 Cong. Rec. H9382-03

(Oct. 7, 1986) (statement of Rep. Berman) (emphasis added)).  The maximum reward of

---

[5] Zediker's no-holds-barred tactics in pursuit of her claims against the Government for a greater share and against OrthoGeorgia for attorneys' fees tend, if anything, to bolster OrthoGeorgia's and the Government's resistance to those claims.  Simply put, the facts generally do not favor Zediker, and her ignore-the-facts, slander-your-opponents strategy has not impressed the Court.

[6] The Eleventh Circuit has not provided a standard for calculating the relator's share.  The Court, however, finds decisions by other district courts persuasive.

25% is reserved for relators who "actively and uniquely assist the government in the prosecution of the case." *United States ex rel. Burr v. Blue Cross & Blue Shield of Fla., Inc.,* 882 F.Supp. 166, 168 (M.D. Fla. 1995) (citation omitted). The relator bears "the burden of proving that [her] contribution warrants up to 25% of the settlement." *United States ex rel. Marchese v. Cell Therapeutics, Inc.*, 2007 WL 4410255, at *7 (W.D. Wash. 2007). Logically, therefore, the starting point for determining the relator's share is 15%, and greater assistance results in greater reward.[7] The actual percentage awarded is left to the court's informed discretion. *Quorum Health,* 171 F. Supp. 2d at 1331.

To inform that discretion, courts have turned to what has been called the "Senate factors" and the Department of Justice's ("DOJ's") internal criteria for calculating the relator's share. *See id.* at 1332-33; *United States ex rel. Barker v. Columbus Reg'l Healthcare Sys.*, 2016 WL 1241095, at *5 (M.D. Ga. 2016); *see also United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 369 F. Supp. 3d 1346, 1354 (N.D. Ga. 2019). The Senate factors are: (1) the significance of the information provided to the government by the *qui tam* plaintiff, (2) the contribution of the *qui tam* plaintiff to the result, and (3) whether the information provided by the relator was previously known to the government. *Quorum Health*, 171 F. Supp. 2d at 1332 (citing S. Rep. No. 99-345, at 28 (1986)). The DOJ guidelines cover these factors and more. They are broken into two categories. One category includes guidelines that increase the relator percentage:

---

[7] The Court rejects Zediker's contention that the starting point should be 25%. Doc. 44 at 8-9. If that were the case, then that would effectively set the finder's fee at 25% without any assistance from the relator. Again, both logic and congressional intent suggest the starting point is 15%, so that a relator may be compensated with a finder's fee and may increase the reward based on the degree of his or her assistance. But even assuming the starting point were 25%, or even the midpoint of 20%, the facts and circumstances here would warrant a decrease to the statutory minimum of 15%.

1. The relator reported the fraud promptly.

2. When he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor or the Government.

3. The *qui tam* filing, or the ensuing investigation, caused the offender to halt the fraudulent practices.

4. The complaint warned the Government of a significant safety issue.

5. The complaint exposed a nationwide practice.

6. The relator provided extensive, first-hand details of the fraud to the Government.

7. The Government had no knowledge of the fraud.

8. The relator provided substantial assistance during the investigation and/or pre-trial phases of the case.

9. At his deposition and/or trial, the relator was an excellent, credible witness.

10. The relator's counsel provided substantial assistance to the Government.

11. The relator and his counsel supported and cooperated with the Government during the entire proceeding.

12. The case went to trial.

13. The FCA recovery was relatively small.

14. The filing of the complaint had a substantial adverse impact on the relator.

*Id.* at 1333-34. The second category includes guidelines that decrease the percentage:

1. The relator participated in the fraud.

2. The relator substantially delayed in reporting the fraud or filing the complaint.

3. The relator, or relator's counsel, violated FCA procedures:

    a. complaint served on defendant or not filed under seal.

    b. the relator publicized the case while it was under seal.

    c. statement of material facts and evidence not provided.

4. The relator had little knowledge of the fraud or only suspicions.

5. The relator's knowledge was based primarily on public information.

6. The relator learned of the fraud in the course of his Government employment.

7. The Government already knew of the fraud.

8. The relator, or relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Government's position in litigation.

9. The case required a substantial effort by the Government to develop the facts to win the lawsuit.

10. The case settled shortly after the complaint was filed or with little need for discovery.

11. The FCA recovery was relatively large.

*Id.* at 1334.

The Government relies on the DOJ guidelines in calculating the relator's share. Doc. 47 at 9-11. Zediker prefers the Senate factors, stating that the first two factors

constitute a "two-prong contribution" test and that the third factor is "folded into both prongs." Doc. 44 at 11. Zediker says the DOJ guidelines are "inherently flawed and completely shaded against relators." *Id.* at 9. The Court disagrees. First, some of the guideline factors clearly favor relators. More importantly, the guidelines encompass patently obvious common sense considerations for determining a relator's share. Certainly, they are far from being "a joke," as Zediker claims. Doc. 52 at 2. Thus, like many other courts, the Court considers both the Senate factors and the relevant DOJ guidelines.[8]

It is undisputed that but for Zediker, the Government would not have known about the fraud it sifted from Zediker's accusations. Docs. 44 at 12; 47 at 19. However, Zediker, despite knowing what she did, failed to promptly report the fraud or file her complaint. Only after she was caught stealing from OrthoGeorgia did she raise her professed concerns. The timing is suspect.

Moreover, Zediker did not provide substantial assistance to the Government. Zediker's accusatory broadsides mostly lacked merit and only caused confusion. For example, having reviewed Zediker's complaint, which she boasts[9] "was not five pages, but 158, with 358 paragraphs and 36,726 words" (Doc. 52 at 8), it is apparent that Zediker's counsel relied not only on his client's claimed "near photographic memory," but the kitchen sink as well, with others having to clean up the mess. Doc. 44 at 13. Moreover, Zediker's photographic memory was apparently blurred because most of her

---

[8] While the State of Georgia does not provide a list of factors to consider for purposes of determining the relator's share, the Court agrees with the Government that the DOJ factors are helpful considerations in evaluating the relator's share for claims under the Georgia False Medicaid Claims Act. Doc. 47 at 10 n.16.

[9] It is not clear why Zediker thinks the length of her complaint merits boasting. Five coherent pages would have been something to brag about.

allegations did not materially assist the Government with its investigation, and some were factually incorrect. *See generally* Doc. 2. They were also conclusory and vague—lacking pertinent details, such as when the fraudulent acts occurred and who engaged in them. *See Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002) (applying Rule 9(b)'s particularity requirements to actions under the False Claims Act). Certainly, the Government found the complaint less than helpful, sending Zediker 117 questions seeking clarification about her allegations. Doc. 47 at 4. Had Zediker and her counsel streamlined her allegations and complied with Rule 9(b), there would have been much less extensive follow-up questions and delay in the investigation.

But Zediker's not so helpful assistance did not stop there. As the Government decided to narrow the case considerably, Zediker, in an effort to change the Government's mind, provided the Government with unsolicited materials that she believed supported her rejected allegations. These materials include "five robust memoranda" on which Zediker's counsel says he spent "over 270 hours" (more will be said about that 270 hours). Doc. 44 at 14. But, as the Government points out, while it did consider what Zediker submitted, the Government found the memoranda simply more of the same "recitations of [Zediker's] position on claims for which the Government had already stated it was not intervening," and the memoranda did not result in expanded liability for OrthoGeorgia or settlement of the claims those memoranda addressed. Doc. 47 at 7 n.11, 16. After reviewing in camera the "five robust

memoranda," which total 35 pages, the Court agrees that this additional assistance was not helpful.[10]  *See* Docs. 86; 87.

Although Zediker points to other documentation to support her claim of substantial assistance, such as her disclosure statement that "was 128 pages, with 385 paragraphs, and 50,018 words," that misses the point.  Doc. 52 at 8.  As Zediker notes in her brief, the Government did not use the information she disclosed.  *Id.* at 8 n.15. That is because, in the Government's view and as it explained to Zediker time and again, most of Zediker's allegations—and the information supporting them—lacked merit.  Put simply, quantity is not a substitute for quality.  Therefore, because the majority of Zediker's confusing and overinclusive documents, including time spent on those documents, did not materially assist in the resolution of the case, the Court concludes that Zediker cannot show substantial assistance.  On the contrary, Zediker largely hampered the Government's efforts to develop the case and unreasonably opposed the Government's position in litigation.  Even with regard to the limited claims the Government ended up pursuing, Zediker's help was not particularly helpful.  For example, Zediker provided the Government with inaccurate information, such as identifying a person who never worked for Arthrex as an Arthrex representative.[11]  Doc. 47 at 15.

Moreover, Zediker's lack of credibility greatly impacted the Government's litigation strategy.  After the Government was blindsided by her guilty plea, it

---

[10] The memoranda largely consist of research on what the parties refer to as the "Kelly Kickback" allegations.  But again, these allegations were not substantiated by the Government and were ultimately dismissed.

[11] In her reply brief, Zediker admits she made a mistake as to the identity of the Arthrex representative; however, she claims the Government is seeking to "blame [her] for investigatory short comings it primarily caused."  Doc. 52 at 9-10.  But clearly, the Government did not cause Zediker to give misinformation.

understandably was reluctant to build its case around a whistleblower who had stolen far more than OrthoGeorgia had fraudulently billed.  Doc. 47 at 17-18.

Next, rather than assisting the Government with the settlement, Zediker "attempted to stop the forthcoming settlement by indicating a desire to challenge both (1) the fairness of the settlement (arguing that the amount for the Arthrex Claim was too small) and (2) the dismissal of the un-intervened claims against both OrthoGeorgia and USG."  *Id.* at 8.  That does not warrant an increase in the award.  *See United States ex rel. Coughlin v. Int'l Bus. Machines Corp.*, 992 F. Supp. 137, 142 (N.D.N.Y. 1998) (awarding relator only 15% of the settlement in part because the relator vigorously opposed the settlement).

Then, after steadfastly opposing settlement with no apparent basis, Zediker at "the eleventh hour" agreed the settlement was "fair, adequate, and reasonable under all the circumstances."  Docs. 47 at 17; 47-1 at 5.  Notwithstanding that agreement, even now, in her briefs, Zediker questions the settlement and expresses her deep "frustration" with the way the Government handled the case.  Docs. 44 at 17 n.10; 52 at 9-10.  In short, far from assisting the Government, Zediker, until the last moment, fought the Government.  Whether or not her fight was warranted, her efforts in that regard do not merit an increase in her award.

Finally, to support an increase in her award, Zediker argues that "as a result of exposing her former employer's fraudulent practices, [she] and her family have suffered substantial financial and emotional hardship."  Doc. 44 at 18.  Because she lost her job, she "lost all of her financial wellbeing and status including her family home."  *Id.*  She also claims she was ostracized by the doctors at OrthoGeorgia.  *Id.*  She urges the

Court to "realize that by the time FCA cases resolve, many relators have been without work for years and are desperate to get paid for their sacrifice in exposing fraud." Doc. 52 at 2.

This argument is disingenuous; actually it's mind-boggling. First, Zediker did not lose her job because she blew the whistle. Second, for a considerable period of time, Zediker, because she was stealing from OrthoGeorgia, did quite well. Finally, her suffering and hardship result from her criminal convictions. Nevertheless, Zediker contends that her guilty plea is simply a red herring. Doc. 52 at 5 n.10. While she admits that what she did was wrong, she attempts to shift the blame to OrthoGeorgia, in much the way she blames the Government, noting the "bitter irony that the defendants here stole far more money from the federal government and only got a small financial slap on the wrist." *Id.* But that is a false statement, given that OrthoGeorgia paid only $380,000 in restitution. And the true "irony" is Zediker's reliance on the hardship factor, which comes not from her "two-prong contribution" test but from the DOJ guidelines— the very guidelines that she believes are "a joke." In short, the Court has considered the DOJ guideline regarding relator's hardship and concludes it does not warrant an increase in her award.

Not only has Zediker failed to support her argument for an increased share, but also, as noted, Zediker's delay in reporting the fraud, her hampering the investigation, and the substantial effort required by the Government to develop the facts, are reasons for decreasing the percentage awarded. But the statute provides for a minimum of 15%, and the Court finds that Zediker is entitled to the minimum share of the settlement proceeds—$114,000.00.

**B.      Attorneys' fees and costs**

The FCA provides, in relevant part, that a relator's attorneys' fees and costs "shall be awarded against the defendant."  31 U.S.C. § 3730(d)(1).  While OrthoGeorgia and Zediker strongly disagree on the reasonableness of Zediker's fee request, both agree that the lodestar method governs Zediker's fee petition.[12]  Docs. 57 at 5; 60 at 3; *see Blue Cross*, 882 F. Supp. at 169 ("Federal courts have applied the standard 'lodestar' methodology in determining a reasonable amount of attorneys' fees in *qui tam* actions." (citing cases)).  "Under the lodestar method, courts determine attorney's fees based on the product of the reasonable hours spent on the case and a reasonable hourly rate."  *In re Home Depot Inc.*, 931 F.3d 1065, 1076 (11th Cir. 2019) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  This product is called the "lodestar," and "there is a strong presumption that the lodestar is the reasonable sum the attorneys deserve."  *Id.*; *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (quotation marks and citation omitted).[13]  However, downward adjustment of the lodestar is "merited . . . if the prevailing party was partially successful in its efforts," a determination the district court makes on a case-by-case basis.  *Resolution Trust Corp.*

---

[12] *See In re Home Depot Inc.*, 931 F.3d 1065, 1076 (11th Cir. 2019) (citing *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)).

[13] In *Bivins*, the district court had determined attorneys' fees under § 1988, not the FCA. *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008). But the Supreme Court has observed that Congress generally patterns attorneys' fees provisions of new statutes on similar provisions of existing statutes and "[t]he standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983) (citations omitted).

*v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1150 (11th Cir. 1993); *see Hensley*, 461 U.S. 424 at 434 (1983).[14]

OrthoGeorgia contends that Zediker's request for attorneys' fees is unreasonable because (1) Zediker's attorneys' and paralegals' rates are excessive and not reflective of the rates charged in the Middle District; (2) some of the tasks for which Zediker's counsel billed were excessive, duplicative, unnecessary, or otherwise non-compensable; and (3) the lack of success in the FCA action warrants a downward adjustment. Doc. 60 at 4-20. The Court addresses these arguments in turn.

### 1. Reasonable Hourly Rate

Generally, a "reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988) (citation omitted). "The party seeking attorney's fees bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (quotation marks and citation omitted).

Here, OrthoGeorgia contends that Zediker's counsel's rates "are nowhere near and hundreds of dollars more than the prevailing market rates recognized within the Middle District of Georgia." Doc. 60 at 6. OrthoGeorgia focuses on the $750 hourly rate

---

[14] The Court in *Hensley* noted that in addition to the results obtained, courts may consider other factors enumerated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), but it cautioned that many of the factors will usually be subsumed in the lodestar calculation. 461 U.S. at 434 n.9. More recently, the Eleventh Circuit, in rejecting an appellant's argument that the district court had erred in not explicitly addressing the *Johnson* factors in a fee award, echoed *Hensley*'s caution that many of the *Johnson* factors are subsumed and explained that when awarding fees under the lodestar method, "the *Johnson* factors are largely redundant." *In re Home Depot Inc.*, 931 F.3d at 1090. The Court, therefore, considers the applicability of the factors, especially successfulness, but it does not "slog through the *Johnson* factors when those factors have little independent bearing on the analysis." *Id.* at 1091.

of Zediker's lead counsel, Mr. Bothwell.  OrthoGeorgia points to the lack of evidence

that the $750 per hour rate was ever charged to or paid by clients in the Middle District

in similar matters.  *Id.*  OrthoGeorgia also notes that in another FCA *qui tam* case in this

district, a $750 per hour rate request was rejected.  *Id.* (citing *United States ex rel.*

*Reeves v. Mercer Transp. Co., Inc.*, No. 1:13-cv-108, Doc. 69 (M.D. Ga. Sept. 19, 2019)

(J. Gardner, presiding)).

Based on the record in this case, including OrthoGeorgia's attorneys' and

paralegals' billings and hourly rates, the Court rejects OrthoGeorgia's argument that the

Court is strictly bound by local prevailing rates.  As Zediker correctly notes, no local

attorneys specialize in FCA litigation, although some may from time to time handle an

FCA case.  As OrthoGeorgia eventually admitted, both relators and *qui tam* defendants

frequently hire lawyers from outside the Middle District, and those lawyers often charge

considerably more than lawyers in the Middle District typically charge.  For that reason,

OrthoGeorgia hired a firm based in Atlanta.  To compare and determine whether

Zediker's counsel were charging reasonable fees, the Court ordered OrthoGeorgia's

counsel to produce their billings in this case and disclose their current hourly rates.

Docs. 67; 74; 77; s*ee In re Home Depot*, 931 F.3d at 1089 n.22 (noting that "courts can

take into account the opposing party's billing to determine reasonable fees") (citation

omitted).  The Court finds this information instructive.

According to OrthoGeorgia's lawyers, OrthoGeorgia negotiated an hourly rate of

$415 for all lawyers, which OrthoGeorgia's lawyers say is a significant reduction in its

typical hourly rates for matters such as this.  Thus, OrthoGeorgia's reasonable hourly

rate exceeds $415.  This also means that a first-year associate representing

OrthoGeorgia charged $415 per hour, although the Court certainly accepts that the $415 blended hourly rate represents a significant reduction in OrthoGeorgia's counsel's billings. But that necessarily means that reasonable hourly rates of experienced *qui tam* lawyers exceed $415. OrthoGeorgia's lead counsel's current hourly rate is $520, and other Atlanta and Savannah partners involved in this matter charge rates between $620 and $625. Doc. 78 at 1.

Notwithstanding Zediker's counsel's tendency to puff (*e.g.*, "ranks among the most accomplished FCA practitioners in the country") and, as repeatedly referenced, their inability to put together a coherent fee petition, the Court acknowledges Zediker's lead counsel's "many years of practice, his contributions to the field, and the acumen he brings to his cases . . . " Doc. 57 at 16. Accordingly, the Court finds that Mr. Bothwell's rate of $750 per hour is reasonable.

However, the requested $285 rate for Mr. Bothwell's first-year associate, who became a member of the Bar in November 2018, and the requested $275 and $255 rates of his paralegals, are not reasonable. Certainly nothing in the record supports the reasonableness of these requested rates, presumably because the parties focus on Mr. Bothwell's rate. However, the Court "is itself an expert on the question [of attorneys' fees] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Norman*, 836 F.2d at 1304 (quotation marks and citations omitted). Based on the Court's experience, the more reasonable hourly rates for paralegals and first-year associates are $150 per hour and $175 per hour, respectively.

## 2. Reasonable Hours Expended

Courts should exclude "hours that were not reasonably expended," such as work that was "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. The Court notes at the outset that there is no basis for OrthoGeorgia's argument that the requested fees should be reduced by 50% or more for work attributable to USG. Doc. 60. As Mr. Bothwell states in his declaration, with supporting documentation, he reduced by 32% his total fees for work unrelated to OrthoGeorgia. Doc. 57-2 at 19. Given the much shorter time Zediker worked for USG, the Court easily finds this reduction reasonable.

### i. *Pre-filing/Filing of Complaint*

Zediker's counsel have separated by category the hours worked. Docs. 57-3 at 1; 81-24. The first category is "Prefiling/filing of Complaint," in which Zediker's counsel claim 691.78 hours.[15] *Id.* OrthoGeorgia argues it should not pay for 25.6 hours that are "duplicative and redundant wherein Mr. Bothwell and a paralegal traveled to and attended the same meetings with the Relator." Doc. 60 at 11. But having reviewed the billing of OrthoGeorgia's lawyers and paralegals, the Court doubts that OrthoGeorgia's lawyers really believe that the attendance of two timekeepers at an event, particularly a client meeting, is unreasonable. Certainly, in the Court's experience, it is reasonable for a paralegal to accompany a lawyer when meeting with clients.

---

[15] The claimed amounts for these categories come from Zediker's counsel's second fee table, designated Exhibit H, at Doc. 89 at 5. Zediker's counsel had initially sought 716.94 hours for pre-filing/filing, then acknowledged that at least 30.70 hours of that time was vague or block-billed. Docs. 81-7; 81-8; 81-9; 81-10. At the Court's request, counsel submitted the second fee table, intended as a correction of the first. Doc. 89 at 5. But 716.94 minus 30.70 is not 691.78. After acknowledging that 30.70 hours in this category were unreasonable, Zediker's counsel only reduced their hours by 25.16. Accordingly, the Court applies a further reduction of 5.54 hours to resolve the inconsistency.

Next, OrthoGeorgia disputes 127.39 hours for work that is either in part or entirely clerical, such as scanning, sorting, and Bates stamping documents, preparing documents and witness indices, and "processing" documents.  Doc. 60 at 11.  Again, OrthoGeorgia's lawyers' argument that paralegals cannot reasonably bill these tasks is contradicted by their own billing records.  Mr. Bothwell swears he has removed time spent on clerical tasks, and the Court has no basis to reject that testimony.  Accordingly, the Court deducts the total only by 0.41 of Shadinger's hours.[16]

Finally, OrthoGeorgia argues that the remainder of the pre-filing/filing billing entries, except for 26.93 hours of work specific to OrthoGeorgia, are "vague and block billed beyond correction and clarification."  Doc. 60 at 11.  The Court disagrees and is satisfied that Zediker's counsel have cured these deficiencies with their supplemental time summaries that provide additional details and a reduction of 5.54 hours from the 691.78 claimed.[17]  Docs. 81-7; 81-8; 81-9; 81-10.

In sum, the total number of hours for "pre-filing/filing of complaint" is 685.83 hours (691.78 – 0.41– 5.54).  That reflects reductions of 5.54 hours to Bothwell's time and 0.41 hours to Shadinger's time, as summarized in the table below.

---

[16] That is the time Zediker's counsel propose to reduce for clerical tasks.  Doc. 81-6.

[17] Once again, 30.70 hours was admittedly unreasonable, and Zediker's reduction fails to account for 5.54 of those hours, so the Court counts them here.  Counsel's filings are not sufficiently detailed for the Court to determine which timekeeper's hours those are.  To avoid the risk of making the Defendant pay for Zediker's counsel's mistakes, the Court applies that additional reduction to Bothwell, the timekeeper with the highest rate.

| Reductions for "Pre-filing/filing of Complaint" | | | |
|---|---|---|---|
| Timekeeper | Clerical time reduction | Vague or block-billed reduction | Total by timekeeper |
| Bothwell | 0 | 5.54 | 5.54 |
| Shadinger | .41 | 0 | .41 |
| Total by category: | .41 | 5.54 | 5.95 |

ii. *Government Interaction/Investigation*

The second category is "Government Interaction/Investigation," in which Zediker's counsel claim 657.73[18] hours. Doc. 81-24. In this category, even more than in the others, Zediker's filings in support of fees comprise a self-contradictory and incoherent mess. The preceding footnote addresses two discrepancies in the total number of hours for this category. The mess does not end there. For example, Critikos claimed 88.56 hours in the motion for fees (Doc. 57 at 3), but he claimed 208.85 hours in the "Final Summary of Fee Petition" attached to the reply brief (Doc. 81-24). The Court sought clarification, and Zediker's counsel filed the second fee table, which

---

[18] This is another category where the Court's attempts to resolve Zediker's motion are plagued by counsel's inconsistencies. Initially, the Court requested Zediker's counsel to provide a more detailed breakdown of his fees than the table submitted as an attachment to the reply brief. Doc. 88. The second table contradicted the first. *Compare* Doc. 89 at 5 *with* Doc. 81-24. The Court resolves these contradictions against Zediker, using the lower number of 657.73 hours instead of the previously claimed 675.95 hours. The contradiction between the two fee tables and the lack of explanation for that contradiction are typical of counsel's filings in support of the motion for fees.

One further contradiction: the second fee table, Exhibit H, claims 657.732 for this category, rather than the 657.73 referenced above. *Id.* Adding up all of Bothwell's claimed hours manually, the total is 739.052. However, Bothwell only claims 739.05 as his total in Exhibit H. *Id.* So the Court follows Bothwell in ignoring the extra .002 hours. Despite the substantive insignificance of that discrepancy, it is yet one more example of the remarkable imprecision and inconsistency of Relator's counsel's fee submissions.

claimed 199.06 hours for Critikos. Doc. 89 at 5. However, the 199.06 number appears to be a typo or a miscalculation: if one adds up the numbers in the second fee table, they total 199.09.[19] *Id.* So Zediker's counsel has proffered three different numbers for Critikos's total hours, without explaining the discrepancies between those numbers. Again, it is a mess.

In addition to the second fee table's internal inconsistency, the two final fee tables differ from one another. Counsel's excuse was that they had "referenced different spreadsheets" in creating the two fee tables, so there were "a few hours variance [sic] for each timekeeper" due to rounding errors. *Id.* at 2. Now, Zediker's counsel say that they "cannot reconcile this discrepancy." *Id.*

Other discrepancies cannot be explained by rounding errors. Although both final summaries are agreed that counsel spent 221.28 hours on the reply brief, the time entries undercut that number: the "total" for the "Entries Re: Reply to Response Brief" is 187.56 hours. *Compare* Docs. 81-24; 89 *with* Doc. 81-22. So there are two different numbers for the reply brief. Perhaps Zediker's counsel were referencing different spreadsheets again.

Not only are the requested hours poorly documented, but also, given the almost complete lack of usefulness of counsel's 657.73 hours to the Government, the hours are clearly excessive. One example is the 270 hours Zediker's counsel allegedly spent preparing the "five robust memoranda" discussed above. Doc. 44 at 14; *see supra* at 11-12. Although the Government did consider the memoranda, it ultimately did not use

---

[19] The math is: 9.85+1.56+14.84+6.73+78.88+23.34+.65+6.55+31.79+24.90.

any of them.  Nor, after reviewing the memoranda, can the Court discern how Zediker's counsel could have possibly spent 270 hours preparing them.

Another example of excess is Zediker's requested 14 hours spent drafting a first amended complaint that was never filed.  Doc. 60-2 at 19.  Again, had Zediker's counsel drafted a more streamlined complaint initially, there would have been no need for an amendment.  Because the Court accepts the time spent replying to the Government's 117 questions for clarification (which is, in essence, an amendment), it is unnecessary and duplicative to include the time drafting an amended complaint, particularly given that it was never filed.[20]

Given the continuing lack of helpfulness and frequent self-contradiction of Zediker's filings, the Court simply cannot determine, conducting an hour-by-hour review, the reasonable number of hours in this category.  Therefore, the Court finds that the best way to determine the reasonableness of Zediker's request is to conduct an across-the-board reduction for excessive hours.  *See Bivins*, 548 at 1350 ("When a district court finds the number of hours claimed is unreasonably high, the court has two choices: it may conduct an hour-by-hour analysis or it may reduce the requested hours with an across-the-board cut." (citation omitted)).  The Court reduces the claimed hours by 60% for excessive and poorly documented hours.  This reduction does not account for the fact that many claims were ultimately unsuccessful; instead, it only reflects time entries which were unreasonable without regard to the ultimate successfulness of the claims.  The total number of hours reduced for this category is 394.64 (657.73 x 0.6).

---

[20] The Court, however, accepts Zediker's counsel's supplemental description of the claimed "duplicative" billing entries.  Doc. 81-11.

That reflects reductions of 174.96 hours of Bothwell's time, 14.94 hours of Critikos's time, 149.41 hours of Birchfield's time, and 55.33 hours of Shadinger's time.

iii. "*Fees on Fees*"

In a category titled "Fees on Fees," Zediker's counsel seek to recover fees for litigating their fee request. Initially, Zediker's counsel claimed 153.4 hours for litigating their request for attorneys' fees, which included settlement negotiations, a request for mediation, and a motion to compel discovery. Doc. 57-3 at 1. Now, Zediker's counsel seek an additional 349.80 hours, which includes 221.28 hours for the reply brief.[21] Doc. 81-24. The additional 349.80 hours are unreasonable.

First, the 52.80 claimed hours expended on the original fee petition are excessive. *Id.* While the attachments to the fee petition were helpful, the brief in support of the petition was largely hyperbolic boilerplate. With regard to the attachments, Zediker's counsel collected declarations from other attorneys to support their hourly rates, applied the lodestar method, and provided a fee statement that explained, albeit with calculation errors, the hours expended on each work entry. While all of that understandably took time and effort, it does not justify 52.80 hours. Accordingly, the Court reduces the total by 30 hours.

Moreover, the claimed 32.83 hours for "fee discovery" are excessive. Most of these hours (19.54) were spent drafting motions to compel mediation and fee discovery

---

[21] Zediker's counsel previously claimed only 187.56 hours in one exhibit to their reply brief and 221.28 in a different exhibit. *Compare* Doc. 81-22 at 6 *with* Doc. 81-24. Of course, they did not explain the inconsistency. As with many other issues in counsel's briefing, therefore, the mess was left to the Court to sort out for Zediker's counsel. The Court raked back through the time entries and summed the individuals' hours to find the explanation for the discrepancy. It turns out that Zediker's counsel had simply failed to reach the correct sum, 221.28, when adding together the time entries. *See generally* Doc. 81-22. So the correct number of hours claimed for the reply brief is 221.28, notwithstanding counsel's representations to the contrary.

prior to filing the fee petition.  Given the unusual circumstances discussed throughout this Order and the size of Zediker's fee request, the Court cannot fault OrthoGeorgia for refusing to mediate.  Additionally, this Court's established practice calls for parties to schedule a telephone conference with the Court before filing motions to compel.  Docs. 55; 64.  When the Court on its own convened that conference, the issues were narrowed substantially, saving all parties considerable time.  Doc. 65.  Accordingly, the Court does not find reasonable the 19.54 hours claimed for efforts to force mediation and the motion to compel.

The Court also finds unreasonable most of the 40.92 claimed hours expended on "JWD"—which apparently refers to work ordered by the Court.  Docs. 81-21; 81-24.  At the July 26, 2019 teleconference, the Court ordered Zediker's counsel to file under seal the hours and expenses they deleted from their total hours and expenses for work attributable to Zediker's claims against USG.  Doc. 65 at 1.  As mentioned earlier, given that Mr. Bothwell, in his 26-page declaration supporting the fee petition, states that he and his firm had already done the exact thing the Court had asked, the Court cannot conclude that counsel reasonably spent 40.92 hours compiling that information after the July 26, 2019 telephone conference.  Doc. 57-2 at 19-20.  Accordingly, the Court finds reasonable 10 hours spent responding to the Court's Order with the materials that counsel already had in their possession.

Finally, while expending 1.97 hours on reviewing the response brief is reasonable, expending 221.28 hours on drafting the reply brief clearly is not.  As the Court explained to Zediker's counsel before the reply brief was prepared, the Court was not interested in the over-the-top rhetoric employed in earlier briefing; rather, the main

focus should have been on the successfulness, or lack thereof, of Zediker's claims. That was particularly important given that Mr. Bothwell informed the Court of a recent Eleventh Circuit decision, which held, according to Mr. Bothwell, that successfulness of the claims is not a relevant factor in fee determinations. Zediker's counsel did not cite to such a decision in the reply brief. Instead, they devoted the first few pages to arguing non-binding and unhelpful authority that did not at all establish that the successful claims analysis does not apply. Doc. 81 at 1-4. That was a waste of the Court's time. The remaining pages of the brief are not much better. The Court is also not impressed with the "Final Summary of Fee Petition" (Doc. 81-24), due to the inconsistencies and calculation errors referenced throughout this Order. Accordingly, the Court reduces the total hours replying to the response brief by 170.

In sum, for the category of "Fees on Fees (post)," the Court finds reasonable 99.34 hours (349.80 – 30.00 – 19.54 – 30.92 – 170.00), which incorporates the 74.22 hours that Zediker's counsel deducted in their supplemental time summary.[22] Doc. 81-24. This number reflects reductions of 70.08 of Bothwell's time, 52.79 of Shadinger's time, 56.92 of Birchfield's time, and 70.67 of Critikos's time, as summarized below.

---

[22] It also appears, based on the Final Summary of Fee Petition, that Zediker's counsel no longer wishes to seek a 1.3 multiplier to the lodestar "to reasonably compensate [them] for undertaking an undesirable case." Docs. 57 at 21; 81-24. To the extent they still do, an enhancement is not warranted in this case. When appropriate, courts should apply a multiplier, enhancing or adjusting upward the lodestar to reward counsel on top of the hourly rates. *In re Home Depot*, 931 F.3d at 1076 (citation omitted). However, because the lodestar is presumed to be sufficient, a multiplier will be appropriate only in "rare and exceptional" cases. *Id.* at 1082 (citation omitted). This case is not one of them. Nor have Zediker's counsel provided "specific evidence" that an enhancement is necessary to provide a reasonable fee. *Id.* (citation omitted). Accordingly, no multiplier is warranted. *See id.* at 1086 ("Because it is inappropriate to enhance a lodestar in a fee-shifting case to account for risk, the District Court abused its discretion in applying a multiplier on the basis of the 'exceptional litigation risk that class counsel took in litigating this case.'").

| Reductions for "Fees on Fees (Post)" | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Original petition | Fee discovery | JWD | Reply brief | Total by timekeeper |
| Bothwell | 15.65 | 12.50 | 4.23 | 37.70 | 70.08 |
| Critikos | 2.00 | 7.04 | 4.43 | 57.20 | 70.67 |
| Birchfield | 12.35 | 0 | 11.02 | 33.55 | 56.92 |
| Shadinger | 0 | 0 | 11.24 | 41.55 | 52.79 |
| Total by category | 30.00 | 19.54 | 30.92 | 170.00 | 250.46 |

iv. *"Relator[']s Share"*

Zediker's counsel also claims fees for "Relators Share," referring to work on the motion for relator's share. Doc. 89-5; 44. But as OrthoGeorgia correctly points out, Zediker's counsel may not recover for work involving a dispute solely between the relator and the Government. Doc. 60 at 14; *see United States ex rel. Taxpayers Against Fraud and Walsh v. Gen. Elec. Co.*, 41 F.3d 1032, 1045-46 (6th Cir. 1994) (noting that fees incurred in a dispute with the DOJ over the relator's share are not included within the scope of § 3730(d)(1) & (2)). And Zediker's reply brief does not address the issue. Accordingly, the time billed for Relator's Share, 64.69 hours, is excluded. That reflects reductions of 29.75 for Bothwell, 31.79 for Critikos, and 3.15 for Shadinger. *See* Doc. 89 at 5.

The following table displays the total number of hours for each category and the corresponding monetary value based on the reasonable hourly rate of each timekeeper:[23]

| Total Reductions and Reasonable Hours | | | | | | | |
|---|---|---|---|---|---|---|---|
| Timekeeper | Claimed hours | Pre-filing/filing | Investigation | Fees on fees | Relator's share | Reasonable hours | Reasonable rate |
| Bothwell | 739.05 | 5.54 | 174.96 | 70.08 | 29.75 | 458.72 | $750/hr |
| Critikos | 199.06 | 0 | 14.94 | 70.67 | 31.79 | 81.66 | $175/hr |
| Birchfield | 502.02 | 0 | 149.41 | 56.92 | 0 | 295.28 | $150/hr |
| Shadinger | 477.25 | .41 | 55.33 | 52.79 | 3.15 | 365.98 | $150/hr |
| **Total:** | 1,917.38 | 5.95 | 394.64 | 250.46 | 64.69 | 1,201.64 | |

Accordingly, the lodestar is **$457,519.50** (458.72 x $750) + (81.66 x $175) + (295.28 x $150) + (365.98 x $150).

### 3. Lack of Success in the FCA Action

OrthoGeorgia argues that the loadstar should be reduced due to the lack of success in the FCA action. Doc. 60 at 16. Eleventh Circuit precedent is clear that after determining the lodestar, the Court may consider altering "the lodestar to reflect attorney success or lack thereof." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d

---

[23] This calculation was made following the supplemental submission by Zediker's counsel clarifying the total hours worked by each timekeeper on a particular category. As Zediker's counsel acknowledge, there are discrepancies in their final calculation.

1159, 1164 (11th Cir. 2017) (citing *Norman*, 836 F.2d at 1302).[24]  When only "partial or

limited success" is achieved, the lodestar "may be an excessive amount" because "the

most critical factor is the degree of success obtained."  *United States v. Everglades

Coll., Inc.*, 855 F.3d 1279, 1292 (11th Cir. 2017) (quoting *Hensley*, 461 U.S. at 436).  To

overcome the presumption that the lodestar is a reasonable sum, consideration of all

distinct measures of success, in addition to the amount of damages, is required to

evaluate whether success was limited.  *Villano v. City of Boynton Beach*, 254 F.3d

1302, 1308 (11th Cir. 2001).  Put another way, in determining whether a downward

adjustment is warranted for lack of success, the Court "court may not employ a cash

register approach in which setting a fee is merely an arithmetical function."  *Cullens v.

Ga. Dep't of Transp.*, 29 F.3d 1489, 1493 (11th Cir. 1994).  The Court must also

consider whether the claims on which the party prevailed and did not prevail were

distinctively different, meaning, "based on different facts and legal theories."  *Popham v.

City of Kennesaw*, 820 F.2d 1570, 1578 (11th Cir. 1987) (citation omitted).  If so, the

prevailing party may not recover on the unsuccessful claims.  *Id.* (citation omitted).

Even when the successful and unsuccessful claims "involve a common core of facts" or

are "based on related legal theories," if the party obtained only "partial or limited

success," the Court "may reduce the lodestar amount if it believes that amount is

excessive in relation to the [prevailing party's] relief."  *Id.* at 1578-79. The Court may

either attempt to identify specific hours spent on unsuccessful claims or reduce the

---

[24] The court may adjust the lodestar to account for other considerations that have not yet figured in its computation, the "most important" being the success of the litigation.  *Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11th Cir. 2000) (citing *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940).

award by some proportion. *Norman*, 836 F.2d at 1302 (citation omitted). This decision is within the district court's discretion. *Popham*, 820 F.3d at 1579.

Here, it is abundantly clear that the settlement was not the result Zediker and her counsel were expecting. As discussed, Zediker listed an array of allegations in her 158-page complaint. She maintains, notwithstanding her representations to the contrary in the Settlement Agreement, that the Government "has undervalued the case by *millions of dollars* and that Defendants are very fortunate to pay so little for such a long and pervasive fraud on the Medicare and Medicaid systems. The system and the Relator could have been better vindicated had more time and attention been brought to bear on certain parts of the case." Doc. 44 at 17 n.10 (emphasis added). Put another way, the majority of her claims were not successful. Zediker's counsel seem to suggest that the claims would have been successful had it not been for the "Government's inexplicable years-long mistake of analyzing [Zediker's] 'ASC Kickback' claim under the Stark Law as well as its multiple misunderstandings of the safe harbor provisions." Doc. 81 at 12 n.22. They state it is not their "fault that by the time the Government was convinced of its errors it felt it was too far along in the settlement process or it would rely on other mistakes of law and fact to justify its settlement position." *Id.* Again, the blame goes to everyone but Zediker (and her crimes) or her counsel. That does not change the fact that most of her claims did not succeed.

Further, the unsuccessful claims are factually different and based on separate legal theories from those on which the parties ultimately settled. While Zediker's counsel contend that all of the claims are intertwined because they were variations of "either kickbacks or billing fraud" (Doc. 57 at 12), the Court is not convinced. Clearly, in

an FCA action, almost all the claims will involve kickbacks or billing fraud. So, if that were the measuring stick, then there would be no need to determine whether the successful and unsuccessful claims are distinguishable. As seen by the "five robust memoranda," Zediker raised numerous theories, mainly based on the Kelly Kickback allegations, and none of those related to what the Government ultimately brought as claims against OrthoGeorgia.

Even assuming Zediker's theories arose from the same "core of facts" as the claims the Government found meritorious, again, Zediker and the Government only obtained partial success, in part due to Zediker's criminal prosecution. Accordingly, the Court concludes that a downward adjustment to the lodestar amount is justified. In doing so, the Court does not apply a "strictly mathematical" or "cash-register" approach. *Everglades*, 855 F.3d at 1293 (citation omitted); *Yellow Pages*, 846 F.3d at 1166 (citation omitted). Rather, the Court considers various policy factors, such as the benefit brought by Zediker's complaint, the positive impact on OrthoGeorgia's conduct, the costs incurred by OrthoGeorgia in defending the lawsuit, and judicial economy. *See Everglades*, 855 F.3d at 1293 (noting the district court did not err in reducing the lodestar amount after expressly taking into account these policy considerations). Therefore, under the facts and circumstances of this case, the Court finds that the relative lack of success in this case warrants a downward adjustment of the lodestar by 70% for a total of **$137,255.85** ($457,519.50 x 0.3).[25]

---

[25] As noted below, the Court applies the 70% reduction to the award after first adjusting the award for the reasons discussed throughout this Order.

### III. CONCLUSION

For the foregoing reasons, Zediker is entitled to a share of **$114,000.00**, and OrthoGeorgia[26] shall pay Zediker's counsel **$137,255.85** in attorneys' fees and **$8,047.52** in costs.[27]

   **SO ORDERED**, this 25th day of September, 2019.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[26] OrthoGeorgia has moved for sanctions, arguing that Zediker's reply brief "impermissibly disclosed information that was filed by OrthoGeorgia under seal" and, thus, that it should be awarded reasonable expenses and fees. Doc. 82 at 1. That motion is **DENIED**. Had defense counsel simply contacted Zediker's counsel or the Court about the improper, but understandable given the circumstances, disclosure, this problem could have been resolved even more quickly than it was.

[27] OrthoGeorgia does not contest the costs.